**Bartholomew PRINCE, Plaintiff,**

v.

**UNITED PARCEL SERVICE, Defendant.**

**Civ. A. No. 92–D–148–N.**

United States District Court,
M.D. Alabama, N.D.

Dec. 30, 1993.

attributable to his race, and that white employees have "misplaced" C.O.D. funds on different occasions, but under similar circumstances, and have not been terminated. At trial, the plaintiff sought to prove that the decisionmaker involved in his termination was biased against black employees by showing that similar acts of dishonesty, though not involving C.O.D. monies, were committed by white employees of UPS, and they were not discharged.

The defendant asserts that plaintiff was discharged for a legitimate, nondiscriminatory reason, namely, for acts of dishonesty. More specifically, UPS contends that plaintiff was discharged because on at least three occasions, plaintiff delivered packages to customers on his route which had been shipped C.O.D., had collected the money from the customer at the time of delivery, but failed to remit the money until a later date and falsified records to conceal these acts. Defendant maintains that all drivers who committed similar acts, whether black or white, were terminated.

This case was tried before the court *ore tenus* on May 6 and 7, 1993. The court having considered the testimony, demeanor and credibility of the witnesses, the exhibits received in evidence, the stipulations of the parties, and their arguments in post hearing briefs, hereby makes the following findings of facts and conclusions of law.

### Findings of Fact

Plaintiff Bartholomew Prince is a thirty-nine year old male who resides in Montgomery, Alabama. [Pretrial Stipulations at 2]. Prince graduated from high school and received a two-year associate's degree in accounting and business from Patterson Technical College. [*Id.*]. He began work with UPS as a part time sorter in 1974 and worked in that position until 1977 when he was hired on a full time basis as a package car driver. [Tr. at 180–181]. During his entire period of employment, plaintiff worked at the Montgomery North Center of UPS. [Pretrial Stipulations at 2].

Defendant UPS is a private company engaged in the business of package delivery. [*Id.*]. Nationwide, UPS is divided into dis-

Kenneth Jay Shinbaum, Julian L. McPhillips, Jr., Montgomery, AL, for plaintiff.

John C. Coleman, Jr., John W. Hargrove, Birmingham, AL, for defendant.

## MEMORANDUM OPINION AND JUDGMENT

De MENT, District Judge.

This cause is now before the Court for findings of fact and conclusions of law following a bench trial held on May 6 and 7, 1993. Plaintiff Bartholomew Prince claimed that his employment with the defendant was terminated because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, *et seq.*) and the Civil Rights Act of 1991. The court has jurisdiction pursuant to 28 U.S.C. § 1331. As discussed below, judgment is due to be entered in favor of the defendant United Parcel Service (UPS).

Plaintiff was a black employee who was terminated on December 20, 1990, allegedly for stealing cash on delivery (C.O.D.) funds. Plaintiff contends that his termination was

tricts. The district relevant to this action is the Alabama District which includes Alabama and the panhandle of Florida. [*Id.*] The Alabama District consists of six divisions, one of which is the Central Division. [*Id.*]. The Central Division encompasses the Montgomery Package Center, the Opelika Center, the Selma Center, and the Thomasville Center. [*Id.* at 3]. The plaintiff worked at the Montgomery Center. [*Id.*].

At the time of the plaintiff's discharge, Charles Trammel was manager of the Central Division, and Ricky Quincy was the supervisor of Loss Prevention in the Montgomery Center. [*Id.*]. Penny A. McCall, currently a Loss Prevention supervisor for UPS, was an intern in Loss Prevention working under the direction of Ricky Quincy at the time of the plaintiff's termination. [Tr. at 254].

The crux of this action revolves around the defendant's C.O.D. procedures. UPS requires all drivers to receive detailed training regarding C.O.D. money handling. [Pretrial Stipulations at 3]. The defendant's procedure is quite specific and provides that any willful disregard of the C.O.D. procedures shall be considered dishonesty and will be grounds for termination of employment. [*Id.* at 4].[1]

UPS's C.O.D. procedure begins with a C.O.D. "tag," which is the label on the package indicating how much money is to be collected from the customer by the driver at the time the package is delivered. [*Id.*]. Upon receiving the customer's money, part of the tag is torn off from the package. [*Id.*]. The tag and the money is kept by the driver until he returns to the center. [*Id.*]. The driver also makes a notation of the C.O.D. delivery, known as "sheeting it in," on his delivery records. [*Id.*]. UPS driver's then fill out a C.O.D. turn-in slip at the end of the day. [*Id.*]. This turn-in slip matches the amount of money collected from the C.O.D.s for that day with both the C.O.D. tags and the delivery records.[2] [*Id.*]. If all the records are correct, the money and the C.O.D. tags are placed in separate sealed envelopes and deposited in a drop box.[3] [*Id.* at 5]. If, on the other hand, the records show that there is an overage or shortage, i.e. the C.O.D. money does not match the C.O.D. records, the drivers are required to report these discrepancies to their supervisor at the end of the day. [*Id.*]. There is a specific block on the turn-in slip in which the driver should note an overage or shortage. [*Id.*]. These procedures mandate that the drivers are to turn in the money on the same day that it is collected. [*Id.*].

UPS routinely and from time to time at night "audits" package cars at the centers to compare the packages which were undelivered and remain in the package car with the driver's records relating to such packages. [Tr. at 272]. In early December, 1990, Penny A. McCall, then an intern working in the Loss Prevention Department, was conducting a routine audit of package cars in the Montgomery North Center. [Tr. at 259–260]. As part of the audit, she checked the package car belonging to Bartholomew Prince. [*Id.*]. She noted a discrepancy in the packages remaining on his car and his delivery records for that day. [*Id.* at 261]. More specifically, she noticed that a C.O.D. "send again," valued at $587.28 involving Graham's Gun Repair, was "sheeted" on the delivery records with a C.O.D. amount circled. This indicated that the package was not delivered. However, there was no corresponding package for this C.O.D. on the car.[4] [*Id.*]. She immedi-

1. The collective bargaining agreement between UPS and plaintiff's union also provides that dishonesty is grounds for immediate termination. [Pretrial Stipulations at 4].

2. A C.O.D. turn-in slip produces two copies. One copy is placed with the envelope containing the C.O.D. tags while the other copy is attached to the driver's delivery records. [Pretrial Stipulations at 5].

3. The envelopes are then removed from the drop box by a supervisor and separated. The envelopes containing the C.O.D. money are forwarded unopened to a bank. The envelopes containing the C.O.D. tags are forwarded to UPS's Birmingham office which uses the tags to write checks to the shippers. [Pretrial Stipulations at 5–6].

4. This discrepancy indicated that the driver may be involved in a "kiting" scheme. "Kiting" occurs when a package is delivered C.O.D. and the money is collected, however, the driver fails to turn in the money that day and does not indicate that the delivery was made on his delivery rec-

ately reported this irregularity to her supervisor, Ricky Quincy. [*Id.*]. At the time of this incident, McCall did not know whose package car she was auditing, ( [*Id.* at 259] ), and none of the records examined by her thereafter reflected that the plaintiff is black. [*Id.* at 269]. After the discovery of the discrepancy, McCall and Quincy conducted a thorough investigation. They visited Graham's Gun Repair and procured a statement from the customer saying the package had been delivered and paid for on Monday, November 26, 1990. [*Id.* at 262].

Upon Graham's confirmation that the package had been delivered and paid for, Quincy, as Loss Prevention Supervisor, undertook a specific audit of the C.O.D. practices of Bartholomew Prince. [*Id.* at 276]. In reviewing the plaintiff's records, Quincy discovered two additional discrepancies involving Prince's C.O.D. records. [*Id.*]. Specifically, Quincy noted that on Thursday, December 13, 1990, and on Monday, December 17, 1990, plaintiff's delivery records reflected two unsuccessful attempts to deliver a $41.62 C.O.D. to Ms. Bertha Smith and $37.00 C.O.D. to Margerie F. Carter, both of Shorter, Alabama. [*Id.* at 276–277]. However, in each of those cases, the package involved was not on plaintiff's package car.[5] [*Id.*].

Furthermore, Quincy reviewed the delivery records of the plaintiff concerning the Graham's Gun Repair delivery. He discovered that plaintiff's turn-in slips and delivery records for the days of November 26th, 27th, 28th, and 29th were all falsified to reflect that Prince had made an "attempted" delivery on these dates, but either the customer did not have the money to pay for the package or the customer was not home. [Def. Exs. 23c, 23e, 23f, 23g, and 23h]. It was not until November 30th that both the turn-in slips and the delivery records of Prince show that the package was delivered and the money was collected from Graham's Gun Repair. [Def. Ex. 23 and 23d]. Quincy discovered that Prince had also falsified the records of the December 13th and 17th C.O.D. deliveries to Bertha Smith and Margerie Carter in

the same manner to reflect that the actual deliveries and money collection did not occur until December 14th and December 21st, respectively. [Def. Exs. 24g, 24e, and 25d; Tr. at 283–289].

At a meeting held December 20, 1990, between plaintiff and various representatives of the defendant, including Trammel and Quincy, the plaintiff was confronted with the facts relating to his deliveries to Graham's Gun Repair and Margerie Carter and the allegations of "kiting." [*Id.* at 293–296]. After plaintiff initially denied the allegations, he then gave various explanations for them. [*Id.*]. All of plaintiff's explanations proved unsatisfactory and, at the end of the meeting, Trammel terminated plaintiff's employment. [*Id.* at 297].

## Conclusions of Law

■ Title VII prohibits discrimination in private employment based upon an employee's race. Plaintiff claims that UPS was guilty of disparate treatment when it terminated his employment because he was black. In order to succeed on a disparate treatment claim under Title VII, a plaintiff must prove intentional discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir.1985).

■ The Supreme Court established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the basic framework within which a plaintiff can prove, circumstantially, intentional discrimination in disparate treatment cases. The *McDonnell Douglas* analysis was clarified by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), by establishing that first, the plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at 252–253, 101 S.Ct. at 1093–1094. In order to establish a *prima facie* case, the

---

ords. [Tr. at 273–274]. This is also known as "C.O.D. manipulation."

**5.** In both of these instances, Quincy obtained written confirmation from the customers that the packages were both delivered and paid for on December 13 and December 17, respectively.

plaintiff must introduce evidence of action taken by the employer "from which one can infer if such actions remain unexplained that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The plaintiff must prove: (1) that he is a member of a protected group; (2) that adverse employment action was taken against him; (3) that a .person outside the protected group did not receive the adverse employment action at issue; and (4) that he was qualified for the position from which he was discharged. *See Goldstein v. Manhattan Indus.,* 758 F.2d 1435, 1442 (11th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985).

■ It is undisputed that the plaintiff is a member of a protected class, that adverse employment action was taken against him, and that he was qualified for the position from which he was discharged. However, in this case, at issue is whether a person outside of the protected group received adverse employment action for similar conduct. In cases in which an employee receives an adverse employment decision such as a discharge due to a work rule violation, a plaintiff must show either (1) he did not violate the rule or that (2) if he did, other employees engaged in similar acts and were not treated similarly. *Nix v. WLCY Radio,* 738 F.2d 1181, 1185 (11th Cir.1984); *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.1980), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980).

Plaintiff points to three instances involving white drivers [6] in the Central Division who were found to be manipulating their C.O.D. deliveries and yet, were not terminated. Plaintiff asserts that this proves that he was not treated similarly. However, the court finds that there is a fundamental factual difference in these occurrences: the drivers, who were named by the plaintiff as having been treated more favorably by UPS, did not

conceal their errors through falsification of records. [Tr. at 112–115].

The first individual plaintiff points to is Kent Turner, a white package driver. According to the testimony of Division Manager Trammell, after Kent Turner had turned in all of the money collected by him and filled out all of his records completely for that particular day, he was given additional money by a supervisor which he put in a separate envelope from his collection envelope. [*Id.* at 93–94]. However, only one of the envelopes were accounted for and the records showed that Turner was $400 short. Turner claimed he turned in both envelopes. [*Id.*]. Though the money was never accounted for, Turner was given the benefit of the doubt because **the records he turned in were accurate.** [*Id.*]. UPS also took into account the fact that the supervisor knew that he had given the money to Turner and would have known about it if it disappeared.[7] [*Id.* at 68].

The plaintiff also points to a second instance which involved Steve Stephens, another white driver. With respect to Steve Stephens, there were two separate transactions involving possible dishonest acts. In the first situation, Stephens was making a delivery when the C.O.D. tag apparently came off the package. Stephens, not knowing that the package was a C.O.D., delivered the package. He did not collect any money nor did he record the delivery as a C.O.D. [*Id.* at 71]. The shipper contacted UPS and explained that it had not received the money for the package. Stephens was then sent back to the customer, the customer determined that he had not paid for the package because neither Stephens nor the customer knew it was a C.O.D. delivery. [*Id.* at 68–72]. UPS considered this an honest mistake and no disciplinary actions were taken.

The second situation concerning Steve Stephens was his failure to turn in $150. In this instance, Stephens had borrowed a pair of pants from package driver Lonnie Turner. [*Id.* at 74–75]. "He went out and did his job

---

**6.** The three drivers were Kent Turner, Steve Stephens, and John Montague.

**7.** It was implied that it would have been foolish for Turner to take this money because there

would be no way to hide his actions since the supervisor was the one who gave the money to him in the first place.

that day, delivered several C.O.D.s, collected the money and tags, made his turn-in that night ... [but] failed to put $150 in the envelope." [*Id.* at 76]. However, Stephens put the correct amount of money on his turn-in slip. [*Id.*]. At the same time, the bank discovered that Stephens was short, Turner found the $150 in the pants Stephens had borrowed and turned the money in. [*Id.*]. Here again, Stephens had not falsified any of his records and UPS concluded that it was a careless error. [*Id.* at 81].

The third driver who was allegedly treated differently because he was white was John Montague. On this occasion, at the first stop of the day, Montague collected $300 on a C.O.D. and "sheeted" it in properly on his delivery records. [*Id.* at 53]. However, he failed to pull the C.O.D. tag off the package when he collected the money. [*Id.* at 51]. At the end of the day, Montague failed to note the C.O.D. on his turn-in slip and failed to turn-in the three hundred dollars. [*Id.*] While Montague was changing clothes, the three hundred dollars fell out of his pocket. [*Id.* at 52]. The money was discovered by another driver who notified the supervisor. [*Id.*]. Subsequently, the $300 was correctly found to represent the C.O.D. on the part of Montague. [*Id.*]. UPS concluded that the money must have been "stuck in his pocket," and, because there was no C.O.D. tag, he failed to note the C.O.D. on his turn-in slip. [*Id.*]. Since Montague's delivery records correctly reflected the delivery, UPS again decided it was carelessness on Montague's part and verbally reprimanded him. [*Id.*]

With respect to these three individuals, the court finds that their situations are factually different from plaintiff's situation. Plaintiff falsified eleven different documents to cover up his C.O.D. manipulation. [*Id.* at 115]. Neither Turner, Stephens, nor Montague falsified documents. Clearly, these instances were not similar acts so as to prove a finding of disparate treatment. The court finds that UPS has an established practice, of according little, or no, discipline, where a C.O.D. shortage is attributable to the negligence of the driver rather than falsification. [*Id.* at 81–83]. The court finds that the incidents involving Turner, Stephens, and Montague were negligence or carelessness, rather than dishonesty.

Further, the court finds that the plaintiff's actions are more similar to the actions of three other employees, Connie Hill and Mike Bower, each white, and Tim Floyd, black. [*Id.* at 97–98]. Their employment with the defendant was terminated after it was discovered they were not remitting the C.O.D. money as collected. Instead they were using it for their own purposes. [*Id.* at 100–102]. Plaintiff attempted to distinguish these individuals' actions from his own by pointing to the fact that UPS requested the assistance of the District Attorney in those individuals' cases because they were stealing the C.O.D. money. Whereas, the defendant did not seek the assistance of the District Attorney for the plaintiff's actions. The court concludes that this is a weak distinction. Both the plaintiff and these individuals were discovered manipulating C.O.D. funds and falsifying records. In all cases, the individuals, whether white or black, were discharged.

Plaintiff admits that he failed to remit C.O.D. money when it was collected. [Tr. at 210–211, 219–221]. Plaintiff also admits that he purposefully falsified his work records to conceal his actions. [*Id.* at 322]. Plaintiff was, therefore, guilty of dishonesty in violation of the UPS collective bargaining agreement and contrary to the established practices of UPS. Since other employees who committed the same offense were likewise discharged, whether black or white, plaintiff has failed to establish a *prima facie* case of race discrimination under Title VII of the Civil Rights Act.

▌ Alternatively, even assuming that plaintiff had established a *prima facie* case based upon these facts, the evidentiary burden of UPS is simply to articulate a legitimate nondiscriminatory reason for the challenged employment decision. *Burdine,* 450 U.S. at 256–259, 101 S.Ct. at 1095–1097. In *Burdine,* the Court made it clear that the burden of production shifts to the defendant but "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093; *Nix,* 738 F.2d at 1185, 1187.

The court finds that the reason advanced by the defendant, i.e. that plaintiff's employment was terminated because plaintiff violated UPS procedures involving C.O.D. funds, is in fact a legitimate nondiscriminatory reason for the challenged employment decision.

With this finding, it becomes incumbent upon the plaintiff to establish by a preponderance of evidence that the reasons offered by the defendant are a mere pretext for discrimination. *Nix*, 738 F.2d at 1187. Plaintiff does not satisfy his burden of producing sufficient evidence of pretext by offering evidence of his own genuinely held belief that he was discriminated against. *Elliott v. Group Medical and Surgical Servs.*, 714 F.2d 556, 557 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984). Plaintiff attempted to show that the defendant's proffered reason was pretext through the examples of Turner, Stephens, and Montague. However, the court finds that plaintiff's evidence relating to C.O.D. shortages of the three package drivers is fundamentally flawed in that none of the drivers who erred, other than the plaintiff, concealed his error through falsification of records.

Plaintiff next attempted to show that defendant's proffered nondiscriminatory reason for discharging the plaintiff was a pretext for discrimination through several occurrences that were not related to C.O.D. manipulation. To establish pretext predicated upon misconduct other than C.O.D. dishonesty, the plaintiff must show that white employees who were guilty of conduct nearly identical to that engaged in by plaintiff were retained, while plaintiff was terminated. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir.1989), *cert. denied*, 495 U.S. 935, 110 S.Ct. 2180, 109 L.Ed.2d 508 (1990) (citing *Nix v. WLCY Radio*, 738 F.2d 1181, 1185 (11th Cir.1984)).

The plaintiff cited several other occurrences which he argued demonstrated that UPS's reason for termination was mere pretext and that UPS was guilty of disparate treatment. The first incident involved Michael McKnight, a white package driver. Charles Trammel, the Montgomery center manager, determined that McKnight was "padding" his stops, i.e. listing as delivery stops addresses to which no delivery was made. [Tr. at 33–34]. Trammell recommended that McKnight be discharged for his actions, and by a letter dated June 12, 1984, McKnight was in fact terminated. [*Id.* at 26]. However, McKnight filed a grievance. At the grievance hearing, McKnight's union representatives and UPS decided to reduce his discipline to a three-day suspension, instead of termination. [*Id.* at 37]. Mr. Trammel played no role in that decision and hence was not aware if any mitigating circumstances were involved. [*Id.* at 38–39].

In 1989, McKnight was again disciplined for performing a "rollover," i.e. returning to a stop to which he had previously delivered a package in order to deliver another one. [*Id.* at 41–42]. However, McKnight's delivery records were accurate and there was no falsification of documents. [*Id.* at 42–43]. McKnight received a warning letter for this infraction. [*Id.*].

In applying the *Hawkins* test, the court finds that the plaintiff has made no showing of conduct similar or identical to McKnight in which a black employee was treated differently. Alternatively, if plaintiff is comparing the McKnight incident to his own actions, clearly, the two are not similar. Plaintiff's actions involve C.O.D. manipulation through the falsification of records while McKnight concerns "rollovers" and no falsification of records.

The only evidence set forth by the plaintiff in which actions of another employee were similar to plaintiff's actions involved William Sexton, a white package driver.[8] UPS has a policy of terminating a driver for "three avoidable accidents within a twelve-month period." [Tr. at 15]. Between 1980–1981, William Sexton was involved in three accidents that the defendants found to be avoidable; however, Sexton was not terminated and only received a warning letter. [*Id.* at 17–21]. Around the same time, plaintiff was

---

8. The action of the plaintiff in this instance does not involve C.O.D. manipulations. Instead, the incident involves certain accidents that occurred in 1980. Thus, there is a strong argument that this conduct is not relevant to this case.

involved in two accidents deemed avoidable by the defendant and was suspended for a day. [*Id.* at 16–18].

Plaintiff asserts that the comparison of these two occurrences shows that defendants were guilty of disparate treatment. However, as the testimony demonstrated, the policy of terminating a driver after "three avoidable accidents" had never been strictly applied. Also, the policy was subject to modification to take into account the time frame of the accidents, the seriousness of each accidents, and the degree of carelessness. [*Id.* at 20–21, 29]. The defendant asserted that the reason for the different treatment between Prince and Sexton was the degree of seriousness and time frame of the accidents.

The court finds that plaintiff has failed to demonstrate by a preponderance of the evidence that the defendant is guilty of disparate treatment. The plaintiff has not showed that he was treated differently than Sexton because he was black. The defendant has set forth a nondiscriminatory reason for its treatment of Prince and the plaintiff has failed to show that the reason is pretextual. Accordingly, plaintiff has failed to carry his burden of proof.

The plaintiff produced at trial several other examples of what he considered to be disparate treatment of blacks. However, the plaintiff has failed to demonstrate the relevancy of this evidence. Nonetheless, even if the evidence was relevant, the court finds that those examples do not demonstrate disparate treatment nor do they demonstrate that the defendant's reason for terminating the plaintiff was pretextual.

Accordingly, the court finds that plaintiff has failed to show misconduct identical, or nearly identical, to that of the plaintiff's. There is no showing that defendant acted any differently with respect to white employees than it did with respect to black employees. Therefore, the court finds that UPS has articulated a substantial reason for discharge which was not a pretext for discrimination. *See Hawkins,* 883 F.2d at 984; *Nix,* 738 F.2d at 1185.

Nevertheless, assuming, arguendo, that plaintiff had demonstrated that the rea-

sons assigned by UPS for the termination of plaintiff were false or unpersuasive; the burden would have remained with the plaintiff to prove that the real reason for his termination was intentional racial discrimination. *St. Mary's Honor Center v. Hicks,* — U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In *St. Mary's,* the trial court found that while the plaintiff had proven that the defendant's articulated reason for the termination therein was pretextual, plaintiff failed to prove that the decision was racially rather than personally motivated. *St. Mary's,* — U.S. at —, 113 S.Ct. at 2748. After the Eighth Circuit reversed the district court, the Supreme Court stated:

> Once the defendant "responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the factfinder must then decide" *not* (as the dissent would have it) whether that evidence is credible, but "whether the rejection was discriminatory within the meaning of Title VII."

*Id.* at —, 113 S.Ct. at 2753 (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714–715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983)). In short, "Title VII does not award damages against employers who cannot prove nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of the present case) race." *Id.* at —, 113 S.Ct. at 2756. The court finds that even if plaintiff had proven that the articulated reasons set forth by the defendant for plaintiff's termination were pretextual, nonetheless, plaintiff has failed to prove that the defendant's actions were motivated by race.

Accordingly, it is CONSIDERED and ORDERED that JUDGMENT be and the same is hereby entered in favor of the defendant United Parcel Service and against plaintiff Bartholomew Prince.

All costs herein incurred are taxed against the plaintiff, for which let execution issue.